**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JIMMY TOBIAS,<br>*Plaintiff*,<br>v.<br>NATIONAL INSTITUTES OF HEALTH, et al.,<br>*Defendants*. | No. 24-cv-1711(DLF) |

**MEMORANDUM OPINION**

This case involves a series of Freedom of Information Act (FOIA) requests submitted by Jimmy Tobias to the National Institutes of Health (NIH), an agency within the Department of Health and Human Services (HHS). Before the Court is the defendant agencies' Motion for Summary Judgment, Dkt. 22, and Tobias's Cross-Motion for Summary Judgment, Dkt. 24. For the reasons that follow, the Court will grant in part and deny in part both motions.

## I. BACKGROUND[1]

NIH is a medical research agency and clearinghouse. In the leadup to the COVID-19 pandemic, NIH corresponded with researchers around the world about their work on coronaviruses, including SARS-CoV-2, the virus that brought about the pandemic. Def. Resp. Stmt. ¶¶ 8, 13–16, Dkt. 27-1. NIH went on to play a "central role in the pandemic response." *Informed Consent Action Network v. NIH*, No. 23-cv-3674, 2025 WL 3484885, at *4 (D.D.C. Dec. 4, 2025) (citation omitted).

[1] Except as otherwise noted, the following facts are derived from undisputed portions of the statements of fact submitted by the parties. The Court therefore dispenses with parallel citations.

Jimmy Tobias, an independent journalist, saw a public interest in accessing NIH's records about COVID-19. He believed that NIH had access to data and research findings that could shed light on the virus's origins. Pl. Br. at 16–17, Dkt. 25. And he hoped to uncover details about how NIH responded to the pandemic—including how it fell short. *Id.* To that end, he made several requests for NIH records under FOIA, 5 U.S.C. § 552 *et seq*., between September 2021 and March 2024. Pl. Resp. Stmt. ¶¶ 7, 20, 47, 58, 70, Dkt. 25-4; Joint Status Rep. of March 17, 2025 at 5–6, Dkt. 17. Those requests fell into five camps.

First, in September 2021, Tobias made what he calls the "Misconduct Request." Pl. Resp. Stmt. ¶ 7; Pl. Br. at 5. As the name suggests, this request aimed to unearth evidence that NIH staff had violated their professional obligations. Specifically, Tobias demanded any "final memos, summaries and/or reports from all closed investigations into misconduct among NIH staff" from 2019 to 2021. Pl. Resp. Stmt. ¶ 7. NIH denied the request in full. *Id.* ¶ 15. Disclosing that information, NIH explained, would mean revealing sensitive information about NIH staff. *Id.* ¶¶ 11–15. And FOIA's Exemption 6 permits agencies to withhold information whose disclosure "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

Tobias filed a second batch of FOIA requests in November 2023, which he calls the "Sequences Requests." Pl. Resp. Stmt. ¶ 23; Pl. Br. at 5. These requests sought emails, sent to or from certain NIH email accounts, that contained keywords associated with SARS-CoV-2 genomic sequences or sequencing projects. Def. Resp. Stmt. ¶ 39. NIH provided 62 pages of responsive documents with redactions. Pl. Resp. Stmt. ¶ 32. Relying on Exemption 6, NIH withheld at least seven categories of information: "(1) names and emails of those individuals involved in the communications; (2) case numbers; (3) case creation dates; (4) case tracking numbers; (5) specific sequence numbers under discussion; (6) details about patients from whom sequence samples were

collected; and (7) links to data hosted in third party locations." Garcia-Malene Decl. ¶ 33, Dkt. 22-2; *accord* Def. Resp. Stmt. ¶ 42.[2]

Tobias also submitted a third batch of requests, which he calls the "Researchers Requests." Pl. Br. at 12. Filed in November 2023, December 2023, and January 2024, these requests targeted NIH's emails with certain external COVID-19 researchers. Pl. Resp. Stmt. ¶¶ 34–36, 58, 70. NIH issued a *Glomar* response to each, *id.* ¶¶ 37, 61, 73, neither confirming nor denying the existence of any responsive documents, *Wolf v. CIA,* 473 F.3d 370, 374 (D.C. Cir. 2007). Agencies invoke *Glomar* if "merely acknowledging the existence of responsive records would itself cause harm cognizable under a FOIA exception." *People for the Ethical Treatment of Animals v. NIH*, 745 F.3d 535, 540 (D.C. Cir. 2014) (citation modified). Here, NIH asserts harm under Exemption 6. Def. Resp. Stmt. ¶ 37.

In a fourth attempt, Tobias requested a set of email attachments—namely, "the four files attached to the e-mail sent on July-12-2018 from a master student at the Wuhan Institute of Virology." Pl. Resp. Stmt. ¶ 47. Tobias labels this request the "WIV Request" (short for "Wuhan Institute of Virology"). Pl. Br. at 4. NIH purported to send Tobias the attachments he requested. Garcia-Malene Decl. ¶¶ 50–52. According to Tobias, however, NIH sent him attachments from the wrong email. Compl. ¶¶ 38, 42, 45.

Tobias' final FOIA filing came in March 2024 when he requested all NIH records pertaining to a meeting that Dr. Anthony Fauci attended in early 2020. Joint Status Rep. of March

---

[2] The parties dispute whether NIH redacted additional information, including "dates of communications"; evidence "that NIH might have removed, replaced, or duplicated GenBank files"; "dates that researchers might have registered, released, or published sequencing information"; and "information about journal articles." Pl. Stmt. Mat. Facts ¶ 42; Def. Resp. Stmt. ¶ 42.

17, 2025 at 5. NIH produced responsive records, some of which it redacted under Exemption 6. *Id.*

Following NIH's disclosures, Tobias filed this suit against NIH and HHS on June 13, 2024. Compl. He alleged that for the five categories of FOIA requests above, NIH failed adequately to search for responsive records, improperly withheld records, or both. *Id.* ¶¶ 91–122.

After Tobias filed the complaint, the parties engaged in months of discussion to narrow the scope of their dispute. As a result, Tobias no longer "challenge[s] NIH's response to" one of the Researchers Requests. Pl. Resp. Stmt. ¶¶ 70–82. And he concedes that "he is satisfied with the agency's" response to his final FOIA request, for records pertaining to Dr. Fauci's meeting. Joint Status Rep. of March 17, 2025 at 5. The parties, however, continue to dispute NIH's responses to his other FOIA filings. Both parties have moved for summary judgment. Dkt. 22, 24.

## II. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When a federal agency moves for summary judgment in a FOIA case, the court views all facts and inferences in the light most favorable to the requester, and the agency bears the burden of showing that it complied with FOIA. *Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009).

To prevail under Rule 56, an agency "must prove that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from [FOIA's] inspection requirements." *Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982) (per curiam) (internal quotation marks omitted). The agency "must show beyond material doubt . . . that it has conducted a search reasonably calculated to uncover all relevant documents." *Weisberg v. DOJ*,

705 F.2d 1344, 1351 (D.C. Cir. 1983). And it bears the burden of establishing that any of the nine enumerated exemptions listed in 5 U.S.C. § 552(b) apply to information the agency withheld. *Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 147 (D.C. Cir. 2006); *accord Mobley v. CIA*, 806 F.3d 568, 580 (D.C. Cir. 2015).

"The peculiarities inherent in FOIA litigation, with the responding agencies often in sole possession of requested records and with information searches conducted only by agency personnel, have led federal courts to rely on government affidavits to determine whether the statutory obligations of [FOIA] have been met." *Perry*, 684 F.2d at 126. A court may grant summary judgment based on an agency affidavit if it contains reasonably specific detail and neither contradictory record evidence nor evidence of bad faith calls it into question. *See Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013). "[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Off. of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011). But if "material facts are genuinely in issue or, though undisputed, are susceptible to divergent inferences," "summary judgment is not available." *Alyeska Pipeline Serv. Co. v. EPA*, 856 F.2d 309, 314 (D.C. Cir. 1988).

## III. ANALYSIS

The parties dispute whether NIH (1) adequately searched for records responsive to the Misconduct and WIV Requests; (2) properly invoked FOIA Exemption 6 to withhold records responsive to the Misconduct and Sequences Requests; and (3) properly issued *Glomar* responses to the Researchers Requests. The Court addresses each issue in turn.

### A. Search

An agency satisfies FOIA if it makes "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information

requested." *Reps. Comm. for Freedom of the Press v. FBI*, 877 F.3d 399, 402 (D.C. Cir. 2017) (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). "[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*." *Weisberg v. DOJ*, 745 F.2d 1476, 1485 (D.C. Cir. 1984). The adequacy of a search "is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case." *Id.*

At summary judgment, the standard takes the form of a burden-shifting framework. An agency can meet its initial burden by providing an affidavit showing "with reasonable detail" that the search "was reasonably calculated to uncover all relevant documents." *Oglesby*, 920 F.2d at 68; *accord Hunton & Williams LLP v. EPA*, 248 F. Supp. 3d 220, 236 (D.D.C. 2017). The burden then "shifts to the FOIA requester to produce 'countervailing evidence' suggesting that a genuine dispute of material fact exists as to the adequacy of the search." *Hunton & Williams LLP v. EPA*, 248 F. Supp. 3d 220, 236 (D.D.C. 2017) (quoting *Morley v. CIA*, 508 F.3d 1108, 1116 (D.C. Cir. 2007)).

**Misconduct Request.** Under this framework, the defendant agencies have not carried their burden with respect to the Misconduct Request. The defendants have not just failed to describe the search in "reasonable detail." *Oglesby*, 920 F.2d at 68. They have provided virtually no detail about the search at all. They rely on an affidavit from Gorka Garcia-Malene, the FOIA officer for NIH. Garcia-Malene Decl. ¶ 1. Garcia-Malene attests that his office "sent a search request to the Office of Management Assessment," the component of NIH that "conduct[ed] the internal investigations sought by Plaintiff." *Id.* ¶ 10. The details end there. Nowhere does the affidavit describe what the "search request" entailed. Nor does it "identify the terms searched or explain how the search was conducted." *Oglesby*, 920 F.2d at 68. The affidavit, in other words,

does not give this Court a basis on which to conclude that the search "was reasonably calculated to uncover all relevant documents." *Id.*

The D.C. Circuit has consistently held that affidavits of the sort here cannot satisfy the government's burden. Take *Aguiar v. DEA*, 865 F.3d 730, 738–39 (D.C. Cir. 2017), which considered an affidavit materially identical to that here. There, the affidavit identified the office "tasked with conducting a search" but did not explain "how" the search proceeded. *Id.* Because such an affidavit is "not sufficiently detailed," the court reversed the grant of summary judgment to the agency. *Id.* (citation omitted). Here, as in *Aguiar*, FOIA demands that an agency come forward with more detail about the scope and method of its search.

Absent those details, the Court cannot resolve whether the search was adequate. Where, as here, an "affidavit [does] not adequately describe the agency's search, summary judgment on the adequacy of the search [is] improper." *Oglesby*, 920 F.2d at 68; *accord Nation Mag., Washington Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 892 (D.C. Cir. 1995). The proper course instead is to order the agency to supplement its affidavit. *Landmark Legal Found. v. EPA*, 959 F. Supp. 2d 175, 183 (D.D.C. 2013) (citation modified); *Wolf*, 569 F. Supp. at 10. The Court will direct the defendant agencies to provide a "detailed explanation[]" about how the search proceeded, making clear why the search would reasonably be expected to capture the documents Tobias requested. *Beltranena v. Clinton*, 770 F. Supp. 2d 175, 187 (D.D.C. 2011).

**WIV Request.** As to the WIV Request, the defendant agencies have met their burden. Recall that this request sought not a vast swath of records, but only four attachments to an email "sent on July-12-2018 from a master student at the Wuhan Institute of Virology." Compl. ¶ 38; Def. Stmt. Mat. Facts ¶ 47. NIH met that targeted request with a targeted search. As Garcia-Malene explained, the email at issue appeared "on page 338 of" NIH's response to a prior FOIA

request made by a third party. Garcia-Malene Decl. ¶ 47. "NIH FOIA reviewed the source records it had received from" the National Library of Medicine when responding to that prior FOIA request. *Id.* ¶¶ 48, 50. As NIH FOIA reviewed those records, "[t]he attachments sought by [Tobias] were found to be included." *Id.* ¶ 51. NIH thus sent Tobias "the complete set of records from" the earlier FOIA request, subject to redactions not relevant here. *Id.* ¶ 52. This process could "be reasonably expected to produce the information requested." *Reps. Comm. for Freedom of the Press*, 877 F.3d at 402 (citation omitted). Indeed, according to Garcia-Malene, it produced exactly that. Garcia-Malene Decl. ¶ 50. And his sworn statement to that effect "enjoy[s] a presumption of good faith." *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981).

Tobias, by contrast, has not met his burden of producing "countervailing evidence" suggesting the search was inadequate. *Morley*, 508 F.3d at 1116. Tobias surmises that NIH produced the wrong documents in response to his request. He points out that in the records NIH disclosed, the email at issue appears in a chain of correspondence. Tobias Decl. Ex. 1 at 1–4, Dkt. 24-3. The chain begins with the email at issue, in which the Wuhan researcher sends NIH staff genomic "sequences" associated with "bat SARS-related coronaviruses." *Id.* at 1. The chain concludes with an email from NIH staff thanking the Wuhan researcher for the submission. *Id.* at 3–4. Because the attachments that NIH disclosed "are positioned" at the end of the email chain, Tobias infers that NIH disclosed the attachments to the wrong email—not the first email in the chain, but the last one. Pl. Reply Br. at 1–2, Dkt. 29.

Tobias' argument on this score misconstrues what FOIA requires. An agency fulfills its obligations if its method was "reasonably calculated to discover the requested documents," regardless whether the agency "actually uncovered" those documents. *SafeCard Servs., Inc. v.*

*SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991); *accord Weisberg*, 745 F.2d at 1485. Although Tobias suggests that NIH mistakenly sent the wrong attachments, his theory does not undermine the reasonableness of NIH's method—reviewing records in which all agree the email at issue appeared.

Tobias' argument is especially tenuous because it requires a series of speculative leaps. Contrary to his claims, it is far from clear from the record that the "positioning" of the documents within NIH's disclosures connotes the email to which the documents were attached. *See* Tobias Decl. Ex. 1 at 3–4; Garcia-Malene Decl. ¶¶ 50–51. Regardless, even if the attachments came from the last email in the chain, Tobias offers no reason to think they would not be identical to the attachments to the first email in the chain. After all, the last email served merely to thank the researcher for sending the sequences. Tobias Decl. Ex. 1 at 3–4. And Tobias appears to agree that the attachments he received contain genomic sequencing data—the very sort of data attached to the first email. *See* Pl. Resp. Stmt. ¶¶ 54–55; Pl. Br. at 2, 4. For all these reasons, Tobias cannot overcome the "presumption of good faith" that attends Gorka-Malene's declaration. *Ground Saucer Watch, Inc. v. C.I.A.*, 692 F.2d 770, 771 (D.C. Cir. 1981). Because a plaintiff cannot meet his burden with "purely speculative claims about the existence and discoverability of other documents," *id.*, the Court will grant summary judgment to the defendant agencies on this question.[3]

[3] The defendant agencies also assert that the email attachments are not "agency records" for which FOIA requires an adequate search. *See* 5 U.S.C. § 552(a)(3)(D). Because the Court concludes that the defendant agencies conducted an adequate search, it need not resolve that issue.

### B. Withholding

FOIA exempts nine categories of information from disclosure. 5 U.S.C. § 552(b)(1)–(9). Relevant here is FOIA Exemption 6, which allows agencies to withhold information whose disclosure "would constitute a clearly unwarranted invasion of personal privacy." *Id.* § 552(b)(6). Although the exemption's text refers only to "personnel and medical files and similar files," this Circuit has been clear that the exemption sweeps more broadly, protecting "not just files, but also bits of personal information, such as names and addresses, the release of which would 'create[] a palpable threat to privacy.'" *Jud. Watch, Inc.*, 449 F.3d at 152 (quoting *Carter v. U.S. Dep't of Com.*, 830 F.2d 388, 391 (D.C. Cir. 1987)). But the exemption's scope is not unlimited. Like all FOIA exemptions, courts must construe it narrowly, giving effect to the public interest in disclosure. *Vaughn v. Rosen*, 484 F.2d 820, 823 (D.C. Cir. 1973).

To determine whether an agency properly invoked Exemption 6, courts undertake a balancing. They first ask whether disclosure of the information "would compromise a *substantial*, as opposed to a *de minimis*, privacy interest." *Horner*, 879 F.2d at 874 (emphasis added). Courts then weigh that interest against the "only relevant public interest," which is "the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." *Jurewicz v. U.S. Dep't of Agriculture*, 741 F.3d 1326, 1332 (D.C. Cir. 2014) (internal quotation marks omitted).

**Misconduct Request.** Judged against these standards, the defendant agencies have not justified their decision to withhold the entirety of the records responsive to the Misconduct Request. It is true enough that those records likely contain some information protected by Exemption 6. Rarely, for instance, will FOIA countenance the unmasking of an employee who was subject to investigation and discipline. *See People for the Ethical Treatment of Animals*, 745

F.3d at 541. Such investigations "carry a stigma and can damage a career." *See McCutchen v. HHS,* 30 F.3d 183, 187 (D.C. Cir. 1994). In the same vein, FOIA will often protect the anonymity of "witnesses" to investigations, who "have an interest in avoiding the embarrassment and potential harassment that may result from public disclosure." *Cotton v. Adams*, 798 F. Supp. 22, 26 (D.D.C. 1992); *accord Horvath v. United States Secret Service,* 419 F.Supp.3d 40, 47 (D.D.C. 2019).

But FOIA's exemptions are not dispensed in gross. That a record may contain some exempt information does not permit an agency to withhold the record in full. FOIA's text is clear on this point, requiring agencies to provide "[a]ny reasonably segregable portion of a record . . . after deletion of the portions which are exempt." 5 U.S.C. § 552(b). To ensure that agencies heed that requirement, this Circuit requires "a relatively detailed justification" why an exemption applies to each "particular part of a withheld document." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977).

The defendant agencies provide no such justification. Here again, they rely on Garcia-Malene, who attests that "NIH determined that the responsive records would be almost entirely protected pursuant to FOIA Exemption (b)(6) and that the privacy interests of the individuals cited in the records far outweighed the public benefit in the information." Garcia-Malene Decl. ¶ 11; *see also id.* ¶¶ 12–14. But that statement paints with the broadest possible brush. By lumping together each "part of [the] withheld document[s]," and offering no explanation about what those parts contain, the affidavit prevents the Court from determining to which parts of the documents the exemption applies. *See Mead*, 566 F.2d at 251.

This justification falls well short of the kinds of showings this Circuit deems sufficient. For instance, an agency can meet its burden by providing a *Vaughn* index, which catalogs the

documents at issue, "provide[s] descriptions" of them, and details why each falls under an exemption. *Jud. Watch*, 449 F.3d at 146; *see also Vaughn*, 484 F.2d at 827–28. Or an agency can "seek *in camera* review of some or all of the documents 'so long as [it] give[s] the reviewing court a reasonable basis to evaluate the claim of privilege.'" *Jud. Watch*, 449 F.3d at 146 (quoting *Gallant v. NLRB,* 26 F.3d 168, 172–73 (D.C. Cir. 1994)). What an agency cannot do is proceed as the defendants have here—omitting any detail about what the documents contain. *Mead*, 566 F.2d at 251. To conceal those details is to prevent the Court from testing the agency's claims. *Id.*

Agencies rarely withhold records in full, even in government investigations. The reason is that "the privacy interest at stake . . . can vary based on many factors, including frequency, nature, and severity of the allegations." *Bartko v. DOJ*, 898 F.3d 51, 66 (D.C. Cir. 2018). The public interest can vary too. The public may have little interest in learning the "identity of disciplined employees." *Stern v. FBI*, 737 F.2d 84, 92 (D.C. Cir. 1984). But that "is distinguishable from other public interests that may arise in requests for disclosure of government investigatory records," *id.*, such as "knowing whether an investigation was comprehensive and that the agency imposed adequate disciplinary measures," *Lurie v. Dep't of Army*, 970 F. Supp. 19, 37 (D.D.C. 1997).

Absent details about the nature of the records at issue here, the Court cannot balance the private and public interests. And that means the Court cannot award summary judgment on this record. Instead, the Court will order the defendant agencies promptly to supplement the record. The defendant agencies shall submit a *Vaughn* index, providing as much detail as feasible about the contents of the responsive records and explaining why an exemption applies to each "particular part" of a record. *Mead*, 566 F.2d at 251. To the extent NIH believes that indexing certain

materials would require disclosing details that FOIA protects, the defendants may request *in camera* review. *See Jud. Watch*, 449 F.3d at 146.

**Sequences Requests.** Turning next to the withholding of portions of the Sequences Requests, NIH disclosed responsive documents—62 pages in all. Pl. Resp. Stmt. ¶ 32. These documents consist of emails sent to or from certain NIH email accounts that contained keywords associated with SARS-CoV-2 genomic sequences or sequencing projects. Def. Resp. Stmt. ¶ 39, Tobias contests a number of redactions in these documents.

*Names and email addresses.* First, NIH withheld "names and emails of those individuals involved in the communications." Garcia-Malene Decl. ¶ 33; *accord* Def. Resp. Stmt. ¶ 42. To justify that withholding, the defendant agencies point to Garcia-Malene's affidavit, which recounts "credible threats to the safety of individual(s) associated with Covid sequence submissions, including researchers, research participants, and collaborators." Garcia-Malene Decl. ¶¶ 39, 63, 75. Indeed, Garcia-Malene attests that "[e]ven peripheral association with Covid genomic research has led to reputational attacks and personal endangerment for those involved." *Id.* ¶ 39.

NIH's redaction of names and emails here preserved the anonymity of those people—those associated "with Covid genomic research." *Id.* ¶¶ 39, 63, 75. As Tobias himself explains, he limited the Sequences Requests to emails "containing specified keywords associated with various SARS-CoV-2 sequences or sequencing project[s]." Pl. Stmt. Mat. Facts ¶ 36. As Garcia-Malene attests, this group of people faces risks to their safety. *See* Garcia-Malene Decl. ¶¶ 39, 63, 75.

That kind of privacy interest fits comfortably within Exemption 6. Courts have not hesitated to hold that safety concerns justify the exemption. *Jud. Watch*, 449 F.3d at 153 (relying on "the danger of abortion-related violence to those who developed mifepristone"). And Tobias provides no record evidence to undercut Garcia-Malene's declaration that these risks are real.

On the other hand, Tobias identifies no public interest weighty enough to overcome these safety concerns. He first says that disclosing the information "would likely shed light on the virus's origins." Pl. Br. at 23. But that is not a cognizable public interest. Rather, the "only relevant public interest" under FOIA is letting "citizens know what their government is up to." *Jurewicz*, 741 F.3d at 1332 (citation modified). At most, then, Tobias can assert an interest in understanding the government's role in the virus' origins. Even as to that interest, however, it "is not immediately apparent" how "knowing these names and addresses" would advance it. *Jud. Watch*, 449 F.3d at 153. Without more, Tobias cannot overcome the "substantial" interest in personal safety. *Besson v. United States Dep't of Com.*, 480 F. Supp. 3d 105, 117 (D.D.C. 2020).

Nor does Tobias' second purported public interest fill the gap. He relies on the public interest in learning how NIH responded to the pandemic. That interest is real, and it is sizable. But again, Tobias fails to link that interest to the information he requests; he does not explain how disclosing the "names and emails" of COVID genomic researchers will clarify the government's pandemic response. This public interest cannot carry the day. As to these redactions, the defendant agencies are entitled to summary judgment.

*Patient information.* The answer is the same for an additional set of redactions. NIH also withheld "details about patients from whom sequence samples were collected." Garcia-Malene Decl. ¶ 33. Tobias appears to concede these redactions were proper. *See* Pl. Br. at 27 (asserting that NIH should remove redactions "other than human patient information"). Rightly so. Patient information does not sit at FOIA's periphery; Exemption 6 protects "medical files" expressly. 5 U.S.C. § 552(b)(6). Patients thus retain a privacy interest in keeping medical records out of the public eye. *See Houser v. HHS,* 486 F. Supp. 3d 104, 116 (D.D.C. 2020). The public interest here does not change the calculus; it is hard to see how disclosing patient information would shed light

on government's workings. On this issue too, the defendant agencies are entitled to summary judgment.

*Other information.* The defendant agencies also redacted a wide range of other information: "[1] case numbers; [2] case creation dates; [3] case tracking numbers; [4] specific sequence numbers under discussion; . . . and [5] links to data hosted in third party locations." Garcia-Malene Decl. ¶ 33; *accord* Def. Resp. Stmt. ¶ 42. Those redactions are justified, the agencies say, because this information "could be used to identify" individuals who were corresponding about coronavirus research. Def. Br. at 35–36, Dkt. 22.

The record is unclear on that point. It is certainly true that through a "mosaic effect," a third-party can sometimes "piec[e] together" information to discover a person's identity. *Citizens for Resp. & Ethics in Washington v. U.S. DHS*, 525 F. Supp. 3d 181, 190 (D.D.C. 2021) (citation modified). But the defendants have not established that this risk is real here. Garcia-Malene fails to explain how releasing the information above would threaten anonymity. *See* Garcia-Malene Decl. ¶ 33. And the record is not even clear about what kinds of "case[s]" and "data hosted in third party locations" are at issue. *See id.* Absent further detail, the Court cannot enter summary judgment. It will therefore order the defendant agencies to supplement the record.

The parties also dispute whether NIH redacted certain additional information: "dates of communications"; evidence "that NIH might have removed, replaced, or duplicated GenBank files"; "dates that researchers might have registered, released, or published sequencing information"; and "information about journal articles." Def. Resp. Stmt. ¶ 42. The Court need not resolve that dispute at this time because the Court cannot yet determine whether the mosaic theory would justify those withholdings. In resolving this factual dispute, the Court would benefit from declarations addressing the issue.

### C. *Glomar* Response

The parties contest one final question: whether NIH properly issued *Glomar* responses to the Researchers Requests. By issuing a *Glomar* response, an agency avoids the requirements to search for and disclose responsive records. *Wolf,* 473 F.3d at 374. Instead, the agency simply "refuse[s] to confirm or deny" the records' existence on the theory that doing so "would cause harm cognizable under an applicable FOIA exception"—here, Exemption 6. *Id.*[4]

In this case, the defendants have not shown that disclosing or denying the existence of responsive records would invade "personal privacy." 5 U.S.C. § 552(b)(6). In arguing otherwise, the defendants point out that the Researchers Requests sought communications between certain external researchers and several NIH email addresses. And at least one of those NIH email addresses—belonging to the Sequence Read Archive team—received "sequence submissions in early Covid research." Pl. Resp. Stmt. ¶ 39. The defendants posit that by disclosing the existence of communications between the researchers and NIH, they would reveal that the researchers were "associated with Covid sequence submissions," thus threatening their "safety." Garcia-Malene Decl. ¶¶ 39, 63, 75.

But the defendants' theory overlooks that the Sequence Read Archive team receives innumerable submissions that have nothing at all to do with COVID research. On the defendants' own telling, the Archive "is the largest publicly available repository of genetic sequencing data, accepting data from all branches of life (e.g., plants, animals, bacteria, etc.) and synchronizing these data with other genetic sequence repositories across the globe." Def. Stmt. Undisputed Facts

[4] The doctrine is named for a Cold War-era seafaring vessel called the *Hughes Glomar Explorer*, which the CIA refused to acknowledge as its own. *Phillippi v. CIA*, 546 F.2d 1009, 1011 (D.C. Cir. 1976). When a journalist submitted a FOIA request for records pertaining to the *Glomar Explorer*, the CIA declined to confirm or deny the records' existence. *Id.* at 1011–12. The district court upheld that response, and so began the *Glomar* doctrine. *Id.*

¶ 27, Dkt. 22-1; *accord* Pl. Resp. Stmt. ¶ 27; Garcia-Malene Decl. ¶ 27. As the Archive explains, it stores "DNA and RNA sequences that represent genome diversity across the tree of life." *Sequence Read Archive*, National Institutes of Health, https://perma.cc/X6BK-AZ6D (archived September 29, 2026). The Court therefore cannot conclude that a person who submits sequences to the Archive has submitted sequences related to COVID. Thus, if the defendants were to acknowledge the existence of responsive records, that admission, on its own, would not reveal that the researchers have ties to COVID sequencing. On this record, the defendants have not met their burden.

That is especially true with respect to two of the Researchers Requests, which the parties call Requests C and D. Pl. Resp. Stmt. ¶¶ 34-35. As to those two requests, the defendants' filings in this Court name the researchers at issue and admit that they "had made submissions . . . regarding a GenBank accession number associated with coronaviruses." Def. Resp. Stmt. ¶¶ 14-15. Where, as here, "an agency has officially acknowledged" "information through prior disclosure, the agency has waived its right to claim an exemption with respect to that information." *Am. C.L. Union v. C.I.A.*, 710 F.3d 422, 426 (D.C. Cir. 2013).

The Court will accordingly grant summary judgment to Tobias on this question. It may well be that after searching for responsive documents, the defendants will conclude that a FOIA exemption justifies withholding or redacting records. The Court takes no position on whether there is a valid basis on which the defendants can withhold any records in full or in part under FOIA. All it holds today is that the defendant agencies have not justified their refusal to acknowledge whether those records exist.[5]

[5] The Court's holding is subject to one exception: Tobias has waived his challenge to the *Glomar* response that the defendants issued in response to his January 23, 2024, FOIA

**CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part the parties' cross-motions for summary judgment. A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

September 30, 2026

request. Pl. Resp. Stmt. ¶¶ 70–82. On that response alone, the defendant agencies are entitled to summary judgment.